[ Date Stamp & Return ]

## IN THE CIRCUIT COURT FOR BALTIMORE CITY

AUG 11 '22 11:49

**STANLEY BASS,**
c/o Hansel Law, P.C.
2514 North Charles Street
Baltimore, Maryland 21218

      *Plaintiff,*

    v.

**MAYOR AND CITY COUNCIL**
**BALTIMORE CITY**
James L. Shea
City Solicitor
City Hall - Room 250
100 North Holliday Street
Baltimore, Maryland 21202

and

**BALTIMORE CITY POLICE**
**DEPARTMENT**
Michael S. Harrison
Police Commissioner
601 East Fayette Street
Baltimore, Maryland 21202

and

**MICHAEL S. HARRISON**
*In his official capacity as the current Baltimore*
*City Police Commissioner*
Baltimore City Police Department
601 East Fayette Street
Baltimore, Maryland 21202

and

**JASON P. GIORDANO**
*Individually and in his official capacity as*
*a Baltimore City Police Detective*
Baltimore City Police Department
601 East Fayette Street
Baltimore, Maryland 21202

**\* Jury Trial Demanded**

Case No.: _____

and

**DAMON A. PECK**
*Individually and in his official capacity as*
*a Baltimore City Police Officer*
Baltimore City Police Department
601 East Fayette Street
Baltimore, Maryland 21202

and

**STEVEN P. BOWMAN**
*Individually and in his official capacity as*
*a Baltimore City Police Sergeant*
Baltimore City Police Department
601 East Fayette Street
Baltimore, Maryland 21202

and

**DEAN PALMERE**
*Individually and in his official capacity as*
*a Deputy Commissioner for the Baltimore*
*City Police Department*
1323 Crofton Drive, Lot 22
Bel Air, Maryland 21014

                    *Defendants.*

AUG 11 '22 11:49

## COMPLAINT AND JURY DEMAND

COMES NOW, Plaintiff Stanley T. Bass, by and through undersigned counsel, and sues

the above-named Defendants, stating as follows:

## INTRODUCTION

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to Md. Code, Cts. & Jud. Proc., § 6-102, as

Defendants are domiciled in the State of Maryland and/or are organized under the laws of

Maryland and have their principal place of business in the State

2

2.      Venue is proper in this court because all of the material events occurred in Baltimore City, Maryland.

3.      Plaintiff provided notice of his claim on or about April 27, 2020 via certified mail, return receipt requested, within one year of the date of the incident subject ot this lawsuit. All conditions precedent for the filing of this suit have been satisfied.

4.      The amount in controversy exceeds $75,000

### PARTIES

5.      Plaintiff Stanley T. Bass (hereinafter "Mr. Bass" or "Plaintiff"), an adult resident of the State of Maryland. Mr. Bass is the aggrieved party in this suit and resides at 3527 Lucille Ave, Baltimore, Maryland 21215.

6.      Defendant Michael S. Harrison (hereinafter "Police Commissioner") is currently employed by Baltimore City, Maryland, through the Baltimore Police Department as the Police Commissioner to the Baltimore Police Department. Harrison was sworn into office as the Police Commissioner of the Baltimore City Police Department on March 12, 2019. Harrison is being sued in his official capacity as Police Commissioner of the Baltimore City Police Department only.

7.      Defendant Jason P. Giordano (hereinafter "Giordano") was, at all times relevant to the occurrences complained of herein, an adult resident of the State of Maryland, employed by Baltimore City, Maryland, through the Baltimore Police Department as a police officer, and at all times relevant hereto was acting in his official capacity as a police officer and under the authority and color of law. At the time of incident, Giordano held a Detective's position at the Baltimore Police Department but was promoted to the rank of Sergeant on July 25, 2016, and is assigned to the Citywide Robbery Unit.

3

8.     Defendant Damon A. Peck (hereinafter "Peck") was, at all times relevant to the occurrences complained of herein, an adult resident of the State of Maryland, employed by Baltimore City, Maryland, through the Baltimore Police Department as a police officer, and at all times relevant hereto was acting in his official capacity as a police officer and under the authority and color of law.

9.     Defendant Steven P. Bowman (hereinafter "Bowman") was, at all times relevant to the occurrences complained of herein, an adult resident of the State of Maryland, employed by Baltimore City, Maryland, through the Baltimore Police Department as a police officer having the rank of Sergeant, and at all times relevant hereto was acting in his official capacity as a police officer and under the authority and color of law.

10.     Defendant Deputy Commissioner Dean Palmere (hereinafter "Palmere") was, at all times relevant to the occurrences complained of herein, an adult resident of the State of Maryland, employed by Baltimore City, Maryland, through the Baltimore Police Department as a Deputy Commissioner to the Baltimore Police Department, and at all times relevant hereto was acting in his official capacity as a police officer and under the authority and color of law.

11.     Defendant Baltimore City is a body politic and corporate body that may sue and be sued.

12.     Defendant Baltimore Police Department (hereinafter "BPD") is a public entity established under the laws of Maryland.

### FACTS COMMON TO ALL COUNTS

13.     On or about May 21, 2010, Plaintiff was arrested for a crime that he did not commit and was subsequently convicted of said crime on February 2, 2011. Nine members of the BPD

4

have been convicted for engaging in corrupt activities through the Gun Trace Task Force including falsifying evidence—a relevant issue in the instant case.

14.     Mr. Bass was victimized by members of the BPD, namely Peck and Giordano. On the date of Mr. Bass's arrest, Giordano and Peck were stationed in their vehicle on the 3500 block of Lucille Avenue facing the opposite direction of traffic. Upon seeing Mr. Bass in the rear yard of 3533 Lucille Avenue, Detective Giordano and Officer Peck alleged that Mr. Bass had engaged in a narcotics transaction after seeing him speak with another individual.

15.     Giordano and Peck approached the two men and unlawfully seized Mr. Bass, without probable cause, ordering him to sit on the sidewalk curb. Mr. Bass calmly cooperated with the officers' requests. In the time that he was sitting on the curb, another vehicle arrived at the scene.

16.     Following the arrival of the other vehicle, Plaintiff was ordered to stand, handcuffed, and placed in the back of the vehicle that the officers had been occupying. One of the officers stated to Mr. Bass that they "got the gun and drugs." Mr. Bass did not own, possess, or have knowledge of the location of any firearm.

17.     Officers then drove Plaintiff toward the Northwest District Baltimore Police station. The relevant police report claimed that during the ride to the station, Mr. Bass volunteered information on the location of a firearm without being prompted. It then states that the officers notified Officer Jemell Rayam (hereinafter "Rayam") of Mr. Bass's arrest and called on Bowman to continue transporting Plaintiff to the police station so that they could investigate the information. Purportedly, the officers recovered a black Luger TEC-DC9 semi-automatic pistol containing one black magazine with 26 live .9mm rounds near 3523 Lucille Avenue and attributed ownership to Mr. Bass.

5

18.     At the Central Booking and Intake Facility ("CBIF"), the officers obtained Mr. Bass's fingerprints for booking and Peck proceeded to use excessive physical force throughout the process despite Mr. Bass's cooperation. The officers also threatened Mr. Bass with 44 years' imprisonment if he was convicted of possessing the planted firearm and narcotics.

19.     Mr. Bass was jailed the same day that he was arrested. He later posted bail on June 2, 2010. Mr. Bass was then imprisoned again on February 2, 2011 after he agreed to plead guilty to the charges associated with his false arrest. On May 1, 2012, Mr. Bass was released on parole.

20.     On or about March 1, 2017, Federal prosecutors indicted seven members of the BPD's GTTF, including Rayam. The individuals were indicted on an assortment of racketeering and conspiracy charges stemming from, among others, planting guns and drugs on suspects and other instances of fabricating or altering evidence.

21.     On or about February 5, 2018, indicted former officer Momodu Gondo implicated arresting Officer Giordano in the crimes of the GTTF when he testified that he distributed funds stolen from GTTF victims among a group of officers including Rayam and Giordano. He also testified that Giordano was present at the scene of a fatal shooting perpetrated by Rayam, Giordano's then-partner, and that Palmere later coached both officers on how avoid legal repercussions and accountability.

22.     The Circuit Court for Baltimore City vacated Plaintiff's conviction on October 2, 2019 as a result of Giordano's involvement in the crimes of the GTTF, determining that Giordano intentionally planted incriminating evidence at the scene of Plaintiff's arrest. The vacating of Mr. Bass's conviction terminated the proceedings in his favor.

23.     As a result of the Defendants' actions, Plaintiff was wrongfully convicted and falsely imprisoned for a total of one year, three months, and eleven days. Plaintiff has suffered,

and continues to suffer, mental anguish, emotional pain and suffering, and financial loss due to his unlawful incarceration at the hands of corrupt police officers.

24.     At all times relevant hereto, Defendants acted under color and pretense of law, and under color of statutes, customs, and usages of the State of Maryland.

25.     At all times relevant hereto, Defendants acted within the scope of their employment, with the power and authority vested in them as officers, agents, and employees of Baltimore City and BPD and incident to the pursuit of their duties as officers, employees and agents of Baltimore City and BPD.

26.     Defendant officers' actions were taken in furtherance of the BPD's business because they were at least partially motivated by a purpose to serve the department, and not to protect their own interests. Officers Peck and Giordano engaged in official police activity when they stopped and falsely arrested Mr. Bass without probable cause, authored a police report using fabricated evidence, and testified against Mr. Bass to convict him of false charges. Mr. Bass was arrested as part of the officers' duties to the BPD to arrest and assist in the prosecution of illegal firearms owners and violent criminals. Further, despite the false nature of Mr. Bass's charges, his arrest and conviction appeared, to the criminal justice system, to be valid for almost a decade.

27.     During the course of Mr. Bass's false arrest, neither of the officers obtained anything of value (i.e., cash, drugs, guns, etc.) from Mr. Bass's person or immediately surrounding areas that was not submitted as evidence to the BPD.

28.     Despite that the officers' falsifying of evidence constitutes misconduct, the similarity in quality of the actions that were taken to actions that are authorized by the BPD, demonstrates that the officers' misconduct was authorized. Officers Giordano and Peck took

7

authorized actions in unauthorized ways and their misconduct was interwoven with authorized conduct.

29.      The BPD, the Police Commissioner, in his position of supervisory authority, and Former Deputy Commissioner Palmere, in his position of supervisory authority, impliedly authorized Officers Giordano and Peck's actions because Mr. Bass's arrest was incident to the performance of the common duties that were entrusted to them as employee officers of the BPD. Mr. Bass's stop and arrest falls within the description of duties that officers of the BPD are hired to routinely perform and occurred during a period of time in which the officers were working as on-duty police officers in the jurisdiction in which they were authorized to serve (Baltimore City).

30.      Defendants and/or any other unnamed officers committed each of the acts knowingly, intentionally, and maliciously. As a result, Mr. Bass is entitled to an award of compensatory and punitive damages.

31.      In the alternative, at all times relevant hereto, the Defendants acted with negligence and/or gross negligence in violation of the lawful duties owed to Mr. Bass.

32.      At no time did Mr. Bass cause or contribute to his injuries.

**The Pattern and Practice of the Baltimore Police Department**

33.      The individual defendants' conduct as alleged herein is reflective of the past and ongoing routine, systemic behaviors within the BPD that effectively abridge civilians' Fourth and Fourteenth Amendment rights by arresting them without probable cause, falsifying evidence, and maliciously prosecuting individuals. These behaviors have taken place within the now-defunct GTTF and continue to take place within the BPD generally.

34.      The Police Commissioner and Former Deputy Commissioner Palmere, in their position of supervisory authority over Peck, Giordano, Bowman, Rayam, and other officers of the

8

BPD, failed to enact or enforce policies to adequately ensure that officers were not engaging in falsifying evidence, giving false testimony, coercing false confessions, and maliciously prosecuting citizens.

35.    In addition to failing to enact or enforce policy that would prevent such abuses of citizens' rights, the Police Commissioner, former Deputy Commissioner Palmere, Baltimore City, and BPD actively enforced, encouraged and promoted policies that encouraged officers such as Peck, Giordano, Bowman, and Rayam to commit such abuses and subsequently protected officers from accountability for their violations of civil rights.

36.    The officers performed their criminal acts against the broader backdrop of a police department which condoned and/or actively promoted the violation of citizens' rights as ordinary practice. This pattern and practice of permitting corruption was exemplified by the actions of former Deputy Commissioner Palmere, who coached officers under his supervision on how to testify in order to avoid accountability for violating the rights of citizens.

37.    The Police Commissioner, former Deputy Commissioner Palmere, the BPD, and Baltimore City thereby knew or should have known about Officers Giordano, Peck, Rayam and Sergeant Bowman's criminal actions and malicious conduct targeting Plaintiff.

38.    Former Deputy Commissioner Palmere personally engaged in coaching officers in how to provide testimony in court to shield themselves from allegations of civil rights violations and illegal activity such as that for which Rayam has been convicted and Giordano has been accused.

39.    The aforesaid policies, or lack thereof, by which defendants condoned or displayed deliberate indifference to violations of rights and criminal actions of police officers have been

evaluated and documented by the United States Department of Justice (hereinafter "DOJ"), exposing the widespread corruption and abuse within the BPD. *See* **Exhibit 1 ( )** attached hereto.

40.     DOJ concluded that "there is reasonable cause to believe that the BPD engages in a pattern or practice of conduct that violates the constitution or federal law. BPD engages in a pattern or practice of:

  a.  Making unconstitutional stops, searches, and arrests;

  b.  Using enforcement strategies that produce severe and unjustified disparities in rates of stops, searches, and arrests of African Americans;

  c.  Using excessive force; and

  d.  Retaliating against people engaging in constitutionally-protected expression."
     Exhibit 1 at 3.

41.     The BPD routinely discriminates against African Americans. The DOJ report specifically found that "racial disparities in BPD's arrests are most pronounced for highly discretionary offenses: African Americans accounted for 91 percent of the 1,800 people charged solely with 'failure to obey' or 'trespassing;' 89 percent of the 1350 charges for making a false statement to an officer; and 84 percent of the 6,500 people arrested for 'disorderly conduct.'" Exhibit 1 at 7.

42.     Finally, the report made a number of findings regarding the deficient policies, training, supervision, and accountability through the BPD, stating, "BPD's systemic constitutional and statutory violations are rooted in structural failures. BPD fails to use adequate policies, training, supervision, data collection, analysis, and accountability systems, has not engaged adequately with the community it polices, and does not provide its officers with the tools needed to police effectively. Exhibit 1 at 10.

43.     The report stated that "[s]tarting in the late 1990s, Baltimore City and BPD leadership expressly adopted a policing model that embraced the principles of "zero tolerance" street enforcement. According to City and BPD leaders, past and present, as well as media reports, Baltimore City based its approach in part on tactics developed by the New York Police Department and brought in consultants from NYPD's program to verse its implantation in Baltimore." Exhibit 1 at 40.

44.     The strategy involved BPD officers making widespread use of pedestrian stops and searches in a purported effort to seize guns and narcotics and deter crime. As part of the "zero tolerance" strategy, BPD leadership pressured officers to increase the number of arrests and to "clear corners," whether or not the officers observed criminal activity. Exhibit 1 at 41.

45.     BPD's implementation of "zero tolerance" resulted not only in a massive increase in the quantity of arrests—but a corresponding decline in quality of policework. For example, of the 100,000 arrestees that BPD processed through CBIF in 2004, over 20 percent were released without charges. *Id.*

46.     In June 2006, the ACLU of Maryland and the NAACP filed a lawsuit alleging that BPD was illegally arresting thousands of residents every year. The complaint asserted that the BPD had not properly trained officers on the legal standard necessary to make an arrest, and had placed pressure on supervisors to bolster numbers, leading to citizens being improperly detained without probable cause. *Id.* at 41.

47.     In 2010, BPD and the City entered into a settlement to resolve the ACLU lawsuit, with BPD agreeing to adopt policies rejecting its former zero tolerance strategy and make changes to existing policies and procedures. *Id.* Notwithstanding the foregoing, BPD failed to implement changes contemplated by the 2010 settlement that were intended to curtail false arrests by BPD

11

officers and, in so doing, perpetuated the practices first set in motion by BPD's "zero tolerance" policy. *Id.* at 42.

48.     Specifically, BPD's failure to engage in meaningful change was noted in the reports of an independent auditor established by the ACLU lawsuit settlement agreement. *Id.* After a four-year monitoring period had passed, the auditor determined that BPD had not reached full compliance on more than half of the conditions of the agreement. *Id.*

49.     Following the audit, it was apparent to BPD senior leadership that BPD officers were still not adequately reporting the circumstances surrounding arrests to allow for meaningful oversight of their conduct to provide any meaningful oversight of street-level enforcement activities. *Id.*

50.     BPD's lack of supervision over street-level enforcement activities by BPD officers perpetuates an operational culture in which such constitutional violations occurred on a persistent, widespread basis.

51.     For example, data maintained by the State of Maryland shows that, from November 2010 – July 2015, BPD made thousands of arrests that reviewing officials declined to act upon. *Id.* at 35.

52.     Analysis of this data reveals that, from November 2010 – July 2015, supervisors at CBIF released 6,736 arrestees without charges being issued. *Id.* Moreover, prosecutors from the State's Attorney's Office declined to charge an additional 3,427 cases, explicitly finding that 1,983 of the underlying arrests lacked probable cause. *Id.* In sum, BPD officers made at least 10,163 arrests that authorities immediately determined did not merit prosecution—an average of roughly 200 arrests per month. *Id.*

53.     However, it is clear that BPD supervisors at all levels of the chain of command were unconcerned with addressing the troubling number of arrests being made by BPD officers in circumstances undeserving of criminal prosecution.

54.     For example, past BPD incident reports regarding warrantless arrests reveal that BPD front line supervisors would consistently "sign off" (*i.e.*, review and approve) subordinates' actions even when the reports describing the basis for warrantless arrests describe egregious constitutional violations. *Id.* at 45.

55.     In fact, after surveying thousands of BPD arrest reports for the period of time spanning November 2010 – July 2015, DOJ could not identify a single arrest questioned by a front-line supervisor. *Id.* DOJ investigators also determined that BPD supervisors often only conducted reviews of such incident reports for purposes of "documenting" officer activity and were unconcerned with assessing whether the arrest conformed to constitutional standards. *Id.*

56.     Yet, as noted above, the lack of oversight regarding warrantless arrests by BPD officers was not limited to the front-line supervisors. Senior BPD leadership also failed to take action necessary to provide meaningful oversight in the form of data collection and pattern analysis. *Id.* at 46, 134-135.

57.     Specifically, despite maintaining information on arrests in a basic database, BPD leadership failed to conduct any analysis to identify trends in the type, frequency, or quality of arrests made by particular officers or units. *Id.* at 46.

58.     Indeed, far from looking for problematic trends in arrest data, BPD senior leadership created a culture which encouraged officers to make as many arrests as possible in that a BPD officer's performance was often evaluated by reference to the raw number of stops and arrests made, particularly for gun and drug offenses. *Id.* at 42. This model created a personal

13

incentive for officers to commit false arrests because many BPD officers believed that the path to promotions and favorable treatment, as well as the best way to avoid discipline, was to increase their number of stops and make arrests for such offenses. *Id.*

59.  For decades, BPD has failed, and continues to fail, to investigate and hold accountable its officers responsible for misconduct of the kind at issue in this case. This has resulted in racist policing policies, and the promotion of abusive, corrupt, and unconstitutional practices. These practices, as well as Defendants' conduct, has caused Plaintiff past and continued suffering and mental anguish as a result of the one year, three months, and eleven days he spent incarcerated for a crime that he did not commit.

**The Result of Plaintiff's Unconstitutional and Maliciously-Pursued Prosecution**

60.  As a direct and proximate result of the aforementioned conduct, actions, and inactions of Defendants, as well as those stated elsewhere herein, Mr. Bass was caused to suffer and continues to suffer mental pain and suffering, including but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, loss of society, shame, and loss of enjoyment of life. Mr. Bass was caused to suffer from economic damages, including, but not limited to, lost time and wages from work, and lost earning capacity, all to his great detriment.

61.  Plaintiff further alleges that all of his injuries, losses, and damages related to this incident were caused solely by the actions of Defendants, as set forth above, without any negligence, want of due care, or provocation on the part of Plaintiff, either directly or indirectly.

62.  Defendants' acts abused their power and were used to oppress Mr. Bass

63.  Defendants' acts were a foreseeable cause of the injuries sustained by Mr. Bass.

64.  At all times relevant hereto, Defendants subjected Mr. Bass to the deprivation of his rights with actual or implied malice, in an unreasonable and unnecessary fashion.

14

65.     Defendants' acts subjected Mr. Bass to a deprivation of his constitutional rights and privileges.

### COUNT I (42 U.S.C. § 1983 4th Amendment Malicious Prosecution)
### Versus the Individual Defendants

1.     Every paragraph not falling under this Count is incorporated herein by reference.

2.     Defendants Peck, Giordano, and Palmere deprived Plaintiff Bass of his rights under the Fourth Amendment of the United States Constitution, said rights including freedom from unreasonable search and seizure, freedom from arrest without probable cause, and freedom from malicious prosecution without probable cause.

3.     At all relevant times, the Defendant officers acted under color of State law, within their capacity and authority as Baltimore City police officers. At all relevant times, Defendant Palmere was the Deputy Commissioner of the BPD, responsible for his own actions in supervising the investigation of the Plaintiff as well as the misconduct of his employees through the policies he set as evidenced by his involvement in covering up the crimes of the members of the GTTF.

4.     The Defendants instituted and continued a criminal proceeding against the Plaintiff. This was done through the acts outlined above, including, but not limited to, applications for warrants and charges and the submission of materials and approvals supportive of those applications, the submission of evidence and reports, and the offering of false and misleading testimony.

5.     The Defendants instituted and continued a criminal proceeding against the Plaintiff without probable cause. There was not sufficient evidence against the Plaintiff to form the basis for probable cause at any point. Any determinations to the contrary were unlawfully obtained by the Defendants through the falsification of police reports as well as perjurious testimony.

15

6.      After Plaintiff was arrested on May 22, 2010, he was incarcerated until he posted bail on June 2, 2010. He was convicted on February 2, 2011 and served time in prison until he was paroled on May 1, 2012. The Defendants' actions deprived Plaintiff of his liberty for one year three months and eleven days. Plaintiff did not consent to the Detective Defendants' deprivation of his liberty.

7.      All proceedings terminated in favor of the Plaintiff on October 2, 2019 when his conviction for the crimes resulting from this incident was vacated.

8.      As a result of the above-described malicious prosecution of the Plaintiff, he was deprived of his liberty without probable cause and denied his rights under the Fourth Amendment of the United States Constitution.

9.      In addition to reviewing and approving the documentation submitted by the Detective Defendants despite knowing of the deficiencies listed elsewhere herein, Defendant Palmere encouraged policies and procedures and promoted the departmental culture which permitted the misconduct at issue in this case.

10.     As a direct and proximate result of Defendants' conduct, Plaintiff has sustained damages as a direct and proximate result of his unlawful search, seizure, false arrest, and false imprisonment, as well as consciously experienced pain, suffering, humiliation, and embarrassment, all to his detriment.

WHEREFORE, Plaintiff respectfully requests compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs, expenses, and attorneys' fees.

### COUNT II (42 U.S.C. § 1983 14th Amendment Malicious Prosecution) <u>Versus the Individual Defendants</u>

11.     Every paragraph not falling under this Count is incorporated herein by reference.

16

12.     At all relevant times, the Defendant officers acted under color of State law, within their capacity and authority as Baltimore City police officers.

13.     Defendants Peck, Giordano, and Palmere deprived Plaintiff Bass of his rights under the Fourteenth Amendment of the United States Constitution, said rights including freedom from summary punishment, his right of access to the courts, and his right to due process.

14.     The Defendants acted with malice and/or with a motive other than to bring any alleged offender to justice. The Defendants manufactured, altered, destroyed, or covered-up evidence which rendered Plaintiff's ability to present his criminal defense effectively and adequately, interfering with his right of access to the courts as protected by the Fourteenth Amendment to the United States Constitution.

15.     Mr. Bass sustained damages as a direct and proximate result of his unlawful search, seizure, false arrest, and false imprisonment, as well as consciously experienced pain, suffering, humiliation, and embarrassment, all to his detriment.

WHEREFORE, Plaintiff respectfully requests compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs, expenses, and attorneys' fees.

### COUNT III (MD Declaration of Rights Malicious Prosecution)
### <u>Versus All Defendants</u>

16.     Every paragraph not falling under this Count is incorporated herein by reference.

17.     Articles 24 and 26 of the Maryland Declaration of Rights protect people in Maryland against unreasonable search or seizure and violations of their rights to due process of law.

18.     The Defendants instituted and continued a criminal proceeding against the Plaintiff. This was done through the acts outlined above, including, but not limited to, applications for

17

warrants and charges and the submission of materials and approvals supportive of those applications, the submission of evidence and reports, and the offering of false and misleading testimony.

19.     The Defendants instituted and continued a criminal proceeding against the Plaintiff without probable cause. There was not sufficient evidence against the Plaintiff to form the basis for probable cause at any point. Any determinations to the contrary were unlawfully obtained by the Defendants through the falsification of police reports as well as perjurious testimony.

20.     The Defendants acted with malice and/or with a motive other than to bring any alleged offender to justice. The Defendants manufactured, altered, destroyed, or covered-up evidence which rendered Plaintiff's ability to present his criminal defense effectively and adequately, interfering with his right of access to the courts as protected by the Maryland Constitution.

21.     After Plaintiff was arrested on May 22, 2010, he was incarcerated until he posted bail on June 2, 2010. He was convicted on February 2, 2011 and served time in prison until he was paroled on May 1, 2012. The Defendants' actions deprived Plaintiff of his liberty for one year three months and eleven days. Plaintiff did not consent to the Detective Defendants' deprivation of his liberty.

22.     All proceedings terminated in favor of the Plaintiff on October 2, 2019 when his conviction for the crimes resulting from this incident was vacated.

23.     As a result of the above-described malicious prosecution of the Plaintiff, he was deprived of his liberty without probable cause and denied his rights under the Fourth Amendment of the United States Constitution.

18

24.     In addition to reviewing and approving the documentation submitted by the Detective Defendants despite knowing of the deficiencies listed elsewhere herein, Defendant Police Commissioner and Defendant Palmere encouraged policies and procedures and promoted the departmental culture which permitted the misconduct at issue in this case.

25.     The individual Defendants committed the tortious acts or omissions described herein within the scope of employment with Baltimore City. As such, Defendant Baltimore City is liable for the Detective Defendants' conduct under the Local Government Tort Claims Act. In the alternative, the individual Defendants' tortious acts or omissions were outside of the scope of employment with Baltimore City and the individuals are personally liable for their own conduct. In either case, the Defendant Baltimore City is liable, under a theory of respondeat superior, for the violations of the Maryland Declaration of Rights detailed above.

26.     As a direct and proximate result of Defendants' conduct, Plaintiff has sustained damages as a direct and proximate result of his unlawful search, seizure, false arrest, and false imprisonment, as well as consciously experienced pain, suffering, humiliation, and embarrassment, all to his detriment.

WHEREFORE, Plaintiff respectfully requests compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs, expenses, and attorneys' fees.

### COUNT IV (Common Law Malicious Prosecution)
### Versus All Defendants

27.     Every paragraph not falling under this Count is incorporated herein by reference.

28.     The Defendants instituted and continued a criminal proceeding against the Plaintiff. This was done through the acts outlined above, including, but not limited to, applications for warrants and charges and the submission of materials and approvals supportive of those

19

applications, the submission of evidence and reports, and the offering of false and misleading testimony.

29.     The Defendants instituted and continued a criminal proceeding against the Plaintiff without probable cause. There was not sufficient evidence against the Plaintiff to form the basis for probable cause at any point. Any determinations to the contrary were unlawfully obtained by the Defendants through the falsification of police reports as well as perjurious testimony.

30.     The Defendants acted with malice and/or with a motive other than to bring any alleged offender to justice. The Defendants manufactured, altered, destroyed, or covered-up evidence which rendered Plaintiff's ability to present his criminal defense effectively and adequately, interfering with his right of access to the courts as protected by the Maryland Constitution.

31.     After Plaintiff was arrested on May 22, 2010, he was incarcerated until he posted bail on June 2, 2010. He was convicted on February 2, 2011 and served time in prison until he was paroled on May 1, 2012. The Defendants' actions deprived Plaintiff of his liberty for one year three months and eleven days. Plaintiff did not consent to the Detective Defendants' deprivation of his liberty.

32.     All proceedings terminated in favor of the Plaintiff on October 2, 2019 when his conviction for the crimes resulting from this incident was vacated.

33.     As a result of the above-described malicious prosecution of the Plaintiff, he was deprived of his liberty without probable cause and denied his rights under the Fourth Amendment of the United States Constitution.

34.     In addition to reviewing and approving the documentation submitted by the Detective Defendants despite knowing of the deficiencies listed elsewhere herein, Defendant

Police Commissioner and Defendant Palmere encouraged policies and procedures and promoted the departmental culture which the permitted the misconduct at issue in this case.

35.     The individual Defendants committed the tortious acts or omissions described herein within the scope of employment with Baltimore City. As such, Defendant Baltimore City is liable for the Detective Defendants' conduct under the Local Government Tort Claims Act. In the alternative, the individual Defendants' tortious acts or omissions were outside of the scope of employment with Baltimore City and the individuals are personally liable for their own conduct. In either case, the Defendant Baltimore City is liable, under a theory of respondeat superior, for the violations of the Maryland Declaration of Rights detailed above.

36.     As a direct and proximate result of Defendants' conduct, Plaintiff has sustained damages as a direct and proximate result of his unlawful search, seizure, false arrest, and false imprisonment, as well as consciously experienced pain, suffering, humiliation, and embarrassment, all to his detriment.

WHEREFORE, Plaintiff respectfully requests compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs, expenses, and attorneys' fees.

### COUNT V (Negligent Training, Supervision, & Retention Resulting in Malicious Prosecution) Versus Defendants Baltimore City, Police Commissioner, and Palmere

37.     Every paragraph not falling under this Count is incorporated herein by reference.

38.     Defendant Baltimore City, Defendant Police Commissioner, and Defendant Palmere had a duty to ensure BPD officers were trained to conduct their law enforcement activities within constitutional and common law prohibitions against malicious prosecution. Defendant Baltimore City, Defendant Police Commissioner, and Defendant Palmere had a duty to discipline

21

and/or fire officers who failed to conduct their law enforcement activities within the constitutional and common law prohibitions against malicious prosecution.

39.     Defendant Baltimore City, Defendant Police Commissioner, and Defendant Palmere breached the duties described above by failing to train officers to meet the obligations described and by affirmatively permitting violations of the constitutional and common law prohibitions against malicious prosecution.

40.     The breaches of duties cited above were the direct and proximate cause of the violations of Plaintiff's constitutional and common law rights not to be maliciously prosecuted.

41.     As a direct and proximate result of Defendants' conduct, Plaintiff has sustained damages as a direct and proximate result of his unlawful search, seizure, false arrest, and false imprisonment, as well as consciously experienced pain, suffering, humiliation, and embarrassment, all to his detriment.

WHEREFORE, Plaintiff respectfully requests compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs, expenses, and attorneys' fees.

### COUNT VI (4th Amendment *MONELL* Claim for a Pattern or Practice of Malicious Prosecution) Versus Defendant Baltimore City

42.     Every paragraph not falling under this Count is incorporated herein by reference.

43.     Defendants Baltimore City and BPD failed to adequately train, supervise, and discipline their officers against arrest, imprisonment, and prosecution without probable cause. the failure to properly train, supervise, and discipline officers demonstrates a gross disregard for the constitutional rights of the public and the Plaintiff, and was a proximate cause of Mr. Bass's injuries.

22

44.     Baltimore City and BPD have instituted and maintained formal and informal customs, policies, and practices that foster, promote, and encourage officers to arrest without probable cause. Among those practices are the following:

a.   The use of arrest and imprisonment without probable cause occurs so frequently that it has become accepted manner by the Defendants and other employees of Baltimore City and BPD. This is a result of Baltimore City and BPD's failure to establish effective procedures, rules, orders, guidelines and practices to ensure that officers will not arrest and imprison citizens without probable cause and to ensure that allegations of false arrest and imprisonment will be thoroughly investigated and appropriately punished when found to have occurred. as a result of this failure, there has been a regular pattern and practice of arrest and imprisonment without probable cause, and failure to investigate. This pattern and practice has been manifested in other prior incidents involving city officers.

b.   Baltimore City and BPD have failed to effectively instruct officers that they have a duty to prevent and report arrest without probable cause when it occurs.

c.   Baltimore City and BPD have failed to keep accurate records as to the number of false arrests and imprisonments of citizens by members of its police force. This policy encourages the use of arrest without probable cause in an improper manner and inhibits Baltimore City from critically evaluating the need for a change in training.

d.   Baltimore City and BPD lack an affective internal affairs procedure and has no meaningful system to control and monitor the recurrence of false arrest and testimony by officers who have a pattern or history of such behavior.

23

e. The policies and customs of Baltimore City and BPD, as set forth herein, demonstrate a gross disregard for the constitutional rights of the public and the plaintiff. At the time of injury to the Plaintiff, the Defendants were operating under unconstitutional customs, policies, and procedures. These customs, policies, and procedures were a proximate cause of the injuries to Mr. Bass.

WHEREFORE, Plaintiff respectfully requests compensatory damages in an amount to be determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition to costs, expenses, and attorneys' fees.

### COUNT VII (14th Amendment *MONELL* Claim for a Pattern or Practice of Malicious Prosecution) Versus Defendant Baltimore City

45.   Every paragraph not falling under this Count is incorporated herein by reference.

46.   Defendants Baltimore City and BPD failed to adequately train, supervise, and discipline their officers against arrest, imprisonment, and prosecution without probable cause. the failure to properly train, supervise, and discipline officers demonstrates a gross disregard for the constitutional rights of the public and the Plaintiff, and was a proximate cause of Mr. Bass's injuries.

47.   Baltimore City and BPD have instituted and maintained formal and informal customs, policies, and practices that foster, promote, and encourage officers to arrest without probable cause. Among those practices are the following:

a. The manufacture, destruction, covering-up, hiding of evidence and offer of false testimony occurs so frequently that it has become accepted manner by the Defendants and other employees of Baltimore City and BPD. This is a result of Baltimore City and BPD's failure to establish effective procedures, rules, orders,

24

guidelines and practices to ensure that evidence will not be manufactured, destroyed, covered-up, or hidden, to ensure no false testimony is given, and to ensure that allegations to the contrary will be thoroughly investigated and appropriately punished when found to have occurred. as a result of this failure, there has been a regular pattern and practice of the manufacture, destruction, covering-up, hiding of evidence, offering of false testimony and failure to investigate. This pattern and practice has been manifested in other prior incidents involving city officers.

b.  Baltimore City and BPD have failed to effectively instruct officers that they have a duty to prevent and report the manufacture, destruction, covering-up, hiding of evidence, and offering of false testimony when it occurs.

c.  Baltimore City and BPD have failed to keep accurate records as to the number of instances of manufacturing, destroying, covering-up, hiding of evidence, and offer of false testimony by members of its police force. This policy encourages falsifying evidence and inhibits Baltimore city from critically evaluating the need for a change in training.

d.  Baltimore City and BPD lack an affective internal affairs procedure and has no meaningful system to control and monitor the recurrence of false arrest and testimony by officers who have a pattern or history of such behavior.

e.  The policies and customs of Baltimore City and BPD, as set forth herein, demonstrate a gross disregard for the constitutional rights of the public and the plaintiff. At the time of injury to the Plaintiff, the Defendants were operating under

unconstitutional customs, policies, and procedures. These customs, policies, and

procedures were a proximate cause of the injuries to Mr. Bass.

WHEREFORE, Plaintiff respectfully requests compensatory damages in an amount to be

determined at trial, but in excess of $75,000, as well as any available punitive damages, in addition

to costs, expenses, and attorneys' fees

### COUNT VIII (*LONGTIN* Claim for a Pattern or Practice of Article 24 & 26 Malicious Prosecution) <u>Versus Defendant Baltimore City</u>

48.    Every paragraph not falling under this Count is incorporated herein by reference.

49.    The Plaintiff's state constitutional rights were violated as described elsewhere

herein.

50.    Baltimore City is responsible for setting policy and procedures governing the

conduct of the individual defendants, all of whom are Baltimore City police officers.

51.    Baltimore City maintained policies, customs, patterns and practices in its police

department of violating the constitutional rights of people in Baltimore City to be free from

malicious prosecution in violation of Articles 24 and 26 of the Maryland Declaration of Rights.

52.    Baltimore City's policies, customs, patterns and practices of violating the

constitutional rights of people in the City to be free from malicious prosecution in violation of

Articles 24 and 26 of the Maryland Declaration of Rights where the actual direct and proximate

cause, as well as the moving force behind the violation of the Plaintiff's constitutional rights.

53.    The above-described policies, customs, patterns and practices of Baltimore City are

so widespread as to rise to the level of official policy promulgated by Baltimore City.

54.    Baltimore City failed to ensure that their officers conducted their law enforcement

activities within constitutional bounds. Further, Baltimore City has permitted and tolerated a

pattern and practice of unjustified, unreasonable, and unlawful abuses of their officers' law enforcement authority, constituting a pattern or practice of law enforcement officers employed by Baltimore City conducting their law enforcement activities unconstitutionally. This unconstitutional pattern or practice has resulted in officers employed by Defendant Baltimore City consistently and continuously violating citizens' constitutional rights, including maliciously pursuing prosecution without probable cause, failing to conduct full and complete investigations, and routinely ignoring exculpatory evidence.

55.    Thus, the deprivation of Plaintiff's rights, as described herein, represents not a single isolated, accidental, or peculiar event, but occurrences in the regular procedures followed by these officers, constituting an illegal pattern or practice of such conduct.

56.    Defendant Baltimore City is aware of, or, in the alternative, should have been aware of, the illegal pattern or practice of their officers conducting their law enforcement activities unconstitutionally.

57.    In addition, Defendant Baltimore City caused their employees to believe that conducting their law enforcement activities unconstitutionally would not be aggressively, honestly, and properly investigated by failing to adequately discipline officers engaging in such misconduct.

58.    Defendant Palmere has been publicly and explicitly accused of approving and encouraging the unconstitutional policing tactics utilized by BPD officers, approving and facilitating such misconduct. For example, Palmere has been accused of coaching officers on how avoid legal repercussions and accountability for their tortious, wrongful, and unconstitutional actions performed within the scope of their duties. Defendant Baltimore City should have foreseen

27

that such policies would promote the proliferation of constitutional violations of citizens' rights, without justification, due process, or probable cause.

59.     Defendant Baltimore City has instituted and maintained formal and informal customs, policies, and practices that foster, promote, and encourage employees to violate the rights of citizens.

60.     This is a result of Defendant Baltimore City's failure to establish effective procedures, rules, orders, guidelines and practices to ensure that such violations do not occur and to ensure that allegations of such violations will be thoroughly investigated and appropriately punished when found to have occurred. As a result of this failure, there has been a regular pattern and practice of conduct similar to that complained of here. This pattern and practice has been manifested in other prior incidents against Defendant Baltimore City.

61.     Defendant Baltimore City has failed and refused to take even elementary steps to protect citizens from the type of abuses detailed above.

62.     The policies and customs of Defendant Baltimore City, as set forth herein, demonstrate a gross disregard for the constitutional and other rights of the public and the Plaintiff, and were a proximate cause of the injuries suffered by Plaintiff.

63.     In addition to the affirmative policy of unconstitutionally and maliciously prosecuting people as described above, Defendant Baltimore City maintains policies, customs, patterns, and practices of inadequately training officers to avoid unconstitutionally and maliciously prosecuting people.

64.     This failure to train officers to avoid unconstitutionally and maliciously prosecuting people amounts to deliberate indifference to the rights of persons with whom the police come into contact.

28

65.     The training and retention procedures of Defendant Baltimore City and the BPD are so inadequate as to demonstrate deliberate indifference in adopting the hiring and training policies and these inadequate hiring or training policies directly caused the plaintiff's injury.

66.     Defendant Baltimore City, through the BPD, had actual and constructive knowledge of continuing constitutional violations and failed to carry out their duty to correct them.

67.     Defendant Baltimore City, through the BPD, has both explicitly and tacitly approved of the type of misconduct of police officers which is the subject of this lawsuit.

68.     Dozens of people have sued Baltimore City and BPD over the type of misconduct of police officers which is the subject of this lawsuit and obtained settlements from Baltimore City after their convictions were vacated as a result of the indictment of members of BPD's GTTF. Ivan Potts said he was walking down the street on September 2, 2015 when several officers jumped out of an unmarked car, stopped him, and then demanded that he consent to a search. When Mr. Potts didn't comply with the request, the officers then slammed him to the ground, and began kicking and beating him while he lay there helpless. Officers handcuffed and then searched him; Mr. Potts said they found no drugs nor weapons. But he said one of the officers produced a gun, and they forced Potts to hold the weapon to get his fingerprints on it. Because of previous convictions, Mr. Potts was charged with six counts related to being a felon in possession of a weapon. At trial, six of the officers testified falsely against him, and Mr. Potts was convicted of three counts on March 2, 2016 and sentenced to eight years in prison. Because Mr. Potts' arrest involved at least one member of the GTTF, his conviction was vacated on April 12, 2017, and charges dismissed on May 16, 2017. Mr. Potts received a $32,000 settlement from Baltimore City after serving about 19-months in prison.

69.     Blanton Roberts was arrested in a similar manner. He said several Baltimore City police officers came up on his porch while on patrol on October 7, 2015. One of the officers said that Mr. Roberts had tugged on his waistband, suggesting the presence of a weapon. The officers said in their report that Mr. Roberts tossed a weapon off the porch, which they later found during a search. Roberts said the officers planted the weapon to justify his arrest. Baltimore City police officers charged Mr. Roberts with illegal possession of a weapon and several related counts. Mr. Roberts had previous felony convictions and pled guilty on July 12, 2016. Because Mr. Robert's arrest involved at least one member of the GTTF, Mr. Roberts's charges were dismissed on July 5, 2017. Mr. Roberts received a $165,000 settlement from Baltimore City after serving two years in prison.

70.     Kevron Evans, a rapper known as "Young Moose," was also arrested in a similar manner. Mr. Evans and a friend were leaving a bar in Baltimore City when three Baltimore City police officers approached them. Without cause, the officers search both men before detaining Mr. Evans and letting the friend go, despite nothing illegal being found. The officers then took Mr. Evans to a different location where another Baltimore City police officer was at by the name of Hersl. Hersl told the other officers to search Mr. Evans again and, after not finding anything again, Hersl got something from his trunk and placed it in Mr. Evans' pocket. Mr. Evans was charged with multiple drug felonies. Mr. Evans accepted a plea deal and received a suspended jail sentence and probation. Baltimore City police continued to harass and target Mr. Evans with false allegations in an attempt to violate his probation. Mr. Evans ended up spending about two years in jail while fighting the charges against him. Because Mr. Evans' arrest involved at least one member of the GTTF, Mr. Evans' conviction was vacated in 2020 and he received a settlement of $300,000 from Baltimore City.

30

71.     Dawud Morris was arrested in 2011 after police officers fabricated a search warrant and claimed to have found drugs and a gun in his home. Mr. Morris said that the officers involved faked a search warrant and planted the gun. Because Mr. Morris' arrest involved at least one member of the GTTF, his conviction was vacated, and he received a $400,000 settlement from Baltimore City for serving about five years in prison on charges related to his arrest.

72.     Donte Pauling was arrested after he was chased unprovoked by Baltimore City police officers in an unmarked car and was said to have thrown a gun into the alley while being pursued. Because Mr. Pauling's arrest involved at least one member of the GTTF, his conviction was vacated, and he received a $165,000 settlement from Baltimore City for serving about two years in prison on charges related to his arrest.

73.     Kendrick Johnson was followed leaving a grocery store by two unmarked cars with Baltimore City police officers in them. Mr. Johnson was stopped by the officers, who planted a gun on his person and said he would go to jail unless he provided information about a nearby murder. Saying he had no knowledge of the case, he was arrested and charged with handgun violations. Mr. Johnson spent three years in prison. Because Mr. Johnson's arrest involved at least one member of the GTTF, his conviction was vacated, and he received a $125,000 settlement from Baltimore City.

74.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, and continues to suffer, mental pain and suffering as a result of the year and two months spent incarcerated for a crime that he did not commit, including, but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, loss of society, shame, grief, anxiety, and loss of enjoyment of life. Plaintiff has further suffered, and continues to suffer, economic damages including, but not limited to, lost earning capacity.

31

WHEREFORE, the Plaintiff respectfully requests compensatory damages in an amount to be determined at trial, in excess of $75,000, as well as any available punitive damages, in addition to costs, expenses, attorneys' fees, injunctive relief ordering Defendants from continuing to utilize the illegal and unconstitutional policing tactics described herein, and such other relief as this Honorable Court deems appropriate.

## JURY DEMAND

Plaintiff demands a jury trial as to all claims so triable.

Respectfully submitted,

HANSEL LAW, P.C.

_____

Cary J. Hansel
AIS No.: 9912150020
Kristen M. Mack
AIS No.: 1712140017
cary@hansellaw.com
kmack@hansellaw.com
2514 North Charles Street
Baltimore, MD 21218
Tel: (301) 461-1040
Fax: (443) 451-8606
*Counsel for Plaintiff*